## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 31 2019, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT MOTHER

Tonja V. Kinder
Monroe Co. Public Defender
Bloomington, Indiana

ATTORNEY FOR APPELLANT FATHER

Stuart K. Baggerly
Monroe Co. Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of T.J., A.J., and Z.K., Minor Children

E.K., Mother, and G.K., Father,

*Appellants*,

v.

The Indiana Department of Child Services,

*Appellee*.

May 31, 2019

Court of Appeals Case No. 18A-JT-2170

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin, Judge

Trial Court Cause Nos.
53C07-1712-JT-974
53C07-1712-JT-975
53C07-1712-JT-976

**Brown, Judge.**

[1] E.K. ("Mother") appeals the involuntary termination of her parental rights with respect to her children, T.J., A.J., and Z.K., and G.K. ("Father," and together with Mother, "Parents") appeals the involuntary termination of his parental rights with respect to his child, Z.K. We affirm.

*Facts and Procedural History*

[2] Mother is the parent of three children, T.J., born on June 22, 2011, A.J., born on August 8, 2012, and Z.K., born on November 29, 2014. Father is the father of Z.K. Tr.J. is the father of T.J., and J.H. is the father of A.J.[1]

[3] In December 2015, the Department of Child Services ("DCS") filed petitions alleging the children were in need of services.[2] On February 29, 2016, the court entered an order finding Z.K. to be a child in need of services ("CHINS"). On July 11, 2016, the court entered a Dispositional Order and Six Month Review Order with respect to Z.K., which ordered Parents to complete certain services. On August 4, 2016, the court entered an order finding T.J. and A.J. to be CHINS and entered a dispositional order. On October 16, 2017, the court entered an Order on Permanency Review stating that Mother was unable or unwilling to put the skills she is taught into practice, tested positive for THC on

---

[1] The court also terminated the parental rights of Tr.J. and J.H., and they do not appeal the termination of their parental rights.

[2] The record does not contain a copy of these petitions.

multiple occasions, failed to appear for drug screens, violated safety plans, and struggled in her relationship with Father. The order stated that Father had not participated in certain services, had been terminated from his domestic violence program, and was arrested for domestic violence against Mother in May 2017 and for theft in July 2017. The court changed the permanency plan to termination of parental rights and adoption.

[4] On December 26, 2017, DCS filed verified petitions for the involuntary termination of the parent-child relationship between Mother and A.J., T.J., and Z.K., and between Father and Z.K. On May 17 and June 13, 2018, the court held hearings on the petitions.

[5] On August 2, 2018, the court entered a twenty-one page order terminating the parent-child relationships with 114 findings of fact. The court found domestic violence between Mother and Tr.J.; Mother admitted the domestic violence in the home was dangerous for T.J.; Father had a history of domestic violence; Mother was homeless for a period of time; and Mother took no steps to protect T.J. when he was living with Tr.J. and was aware there was a registered sex offender living in the same home. It found that Father was charged with domestic battery against Mother on July 23, 2014; Mother reported that a pencil was shoved in her eye; and Father pled guilty to domestic battery as a class A misdemeanor on January 26, 2015. It found that Z.K. was found at the home unsupervised on December 1, 2015; Parents were found sleeping upstairs; and they admitted they had left Z.K. downstairs for several hours. It also found that police officers found one-year-old A.J. locked in her room on May 26,

2015; Mother stated that she and Father locked A.J. in her room each night to prevent her from leaving the room; and Mother admitted that she had punched Father in the stomach and hit him with her purse.

[6] The court noted that Guardian ad litem Melissa Richardson ("GAL Richardson") testified that the children were starving for consistency and predictability and when she attempted to explain that the children needed a primary caregiver, it became clear that Mother did not understand what that meant. During May and June, 2016, DCS offered intensive in-home services to Parents but domestic violence continued between Parents; on June 15, 2016, Father shoved Mother into a vacuum cleaner in T.J.'s presence; Mother would not allow Family Case Manager Amanda Grossi ("FCM Grossi") to photograph her injuries because she stated that she was not sure they were caused by Father; a safety plan created to prevent further domestic violence was not followed; and on July 11, 2016, the children were removed from Mother's care due to ongoing drug use, continued domestic violence, inappropriate discipline by Father, and lack of compliance with services. It found that a new incident of domestic violence occurred in May 2017 when Father choked Mother in T.J.'s presence to the point where she could not breathe; Father was arrested for domestic battery; and Mother minimized his behavior and stated that "he only choked me a little bit." Appellants' Appendix Volume II at 17.

[7] The court found that T.J. reported prior sexual abuse and was struggling with sexually inappropriate behaviors and Parents struggled to understand the importance of the safety plans put in place for T.J. and his siblings and did not follow the safety plans. It found that A.J. had been diagnosed with PTSD, threatened to kill herself, and required a consistent and stable environment. It found that Parents were self-medicating with marijuana; Mother would take her medication as prescribed at times but continued to use marijuana; and Mother ceased taking her medication in November or December 2017 at Father's urging. It found that Mother did not complete her psychological evaluation as ordered; she stated on two occasions that she could not handle Father's behaviors and needed to check herself into the mental health unit at Bloomington Hospital; she participated in less than half of her scheduled drug screens and only three in 2018; and she regularly admitted to using marijuana.

[8] The court noted that GAL Richards testified that Mother is not benefitting from services and that, despite years of intensive services, Mother periodically states that she does not understand why her children were removed from her care. It found that Father never completed treatment; he told his therapist, Ron Smith, on February 18, 2016, that if his wife cheats on him and does not tell him first, he will kill her and her ex-boyfriend; he came to counseling sessions while impaired and could not maintain sobriety; Mother called Father's home-based therapist in November or December 2017 and the therapist could hear screaming; Father does not believe that he is a batterer or that he needs treatment; he threatened to harm himself by jumping off a parking garage in in

May 2016; and he participated in only 63 of 147 possible drug screens and completed only three in 2018.

[9] The court concluded that there was a reasonable probability that the conditions which resulted in the removal of the children or the reasons for placement outside the home would not be remedied, and that the continuation of the parent-child relationship posed a threat to the well-being of the children. It also concluded that termination of the parent-child relationship was in the best interests of the children.

## *Discussion*

[10] The issue is whether the evidence is sufficient to support the termination of the parental rights of Parents. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[11] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[12] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently

confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[13] Mother argues that she was working to remedy the conditions that caused the removal of the children. She challenges the court's conclusions that she had not benefitted from the services and that she did not think she needed parenting instructions. She also asserts that the children are perfectly safe in her care and that termination is not in the children's best interests.

[14] Father argues that he made great strides in remedying the conditions that caused Z.K. to be removed. He challenges the court's conclusions that he had a history of domestic violence, that domestic violence continued, and that he has not benefitted or actively engaged with the multitude of services offered. He also argues that termination is not in the child's best interests.

[15]     DCS contends that Mother and Father do not specifically challenge any of the court's findings of fact and that they "rely almost exclusively on the court's termination order in their statement of the facts." Appellee's Brief at 29. It asserts that the reasons for the children's continued removal include the failure to benefit from services, failure to provide appropriate care and supervision, and failure to address their mental health, domestic violence, and substance abuse. It also argues that termination is in the children's best interests.

[16]     In determining whether the conditions that resulted in the children's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *Id.*

[17]     The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but

also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[18] To the extent Mother and Father do not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied.*

[19] With respect to Mother and Father's failure to make progress, we observe that, in addition to the unchallenged findings, FCM Grossi testified that Mother had been mostly compliant in services but had not internalized what she had learned in those services to be able to apply them. When asked if there had been any recent conversations with Mother that would indicate lack of progress regarding her role as a parent in the CHINS case, she answered:

> Sure, yes. Recently[, Mother] has made statements to me . . . for example she called and reported that after a visit, she had a visit with [T.J.] on a Tuesday, she called a week later and reported to me that he had a bruise on his leg. [I] asked her why she didn't report it until now. [S]he stated to me that it wasn't her responsibility to do things like that. That she told the visit

supervisor that DCS had taken her children away . . . and therefore it . . . was not her responsibility to keep me informed of those things.

Transcript Volume IV at 129. She also testified that she was asking the court to terminate parental rights because "I don't feel like . . . the reasons for removal have been remedied, I don't feel like the parents have made significant progress in address [sic] what the department has asked them to address. Um I don't feel the children's, the children would be safe in returning to the home today." *Id.* at 159.

[20] Cummings, the therapist who worked with Parents, testified that T.J. struggled with sexually inappropriate behaviors and "really struggled" with loud noises or chaos in general. Transcript Volume IV at 229. She testified that Parents were not able to follow through with the safety plans. When asked if they made statements that would demonstrate that they understood their role in parenting a child with trauma, she answered: "Unfortunately no. I felt like they actually fought me every time that I tried to explain how trauma was affecting . . . his behaviors and I felt that they would choose not to use them because they felt that the way they were parenting was appropriate." *Id.* at 231-232.

[21] As to the drug issue, Mother indicated that there had been periods of time recently where she did not complete drug screens and admitted that she continued to use marijuana. GAL Richardson indicated that Mother and Father ceased participation in almost all drug screens.

[22]     With respect to the domestic violence, GAL Richardson testified that Mother minimized the impact of domestic violence. Smith, a therapist, testified that Father participated in a domestic violence program, but was discharged twice from the batterer's treatment program. When asked if Father admitted to being a batterer, FCM Grossi answered: "No. [I]n fact in all of my conversations with [Father] again made it clear to me that he feels like batterer's intervention treatment was not what he needed." *Id.* at 137.

[23]     Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the children's removal will not be remedied.

[24]     In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would

impermissibly invert the best-interests inquiry. *Id.* at 648. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[25] FCM Grossi testified that she was asking the court to terminate parental rights. Cummings, the therapist, testified that she believed the children should proceed with adoption. GAL Richardson testified that she recommended termination of parental rights and that "the final outcome is still that we don't have a stable home for kids after years of trying." Transcript Volume V at 75. When asked if she believed adoption was in the children's best interest, GAL Richardson answered: "Absolutely." *Id.* at 78. Based on the testimony, as well as the totality of the evidence in the record and set forth in the trial court's termination order, we conclude that the court's determination that termination is in the best interests of the children is supported by clear and convincing evidence.

[26] Affirmed.

May, J., and Mathias, J., concur.